[See note to Case No. 13,479.]

STOKES v. KENDALL. See Case No. 15,-517.

## Case No. 13,481.
### STOKES v. MOWATT.
[1 U. S. Law J. 305.]

Circuit Court, New York.[1] Sept. Term, 1817.

EQUITY—PRESUMPTION—ADMISSION OF INTEREST—RIGHTS TO FUND.

1. Where a defendant who has received a joint debt, admits the joint interest of the plaintiff, but does not state its amount, which he had an opportunity of knowing, the plaintiff's interest, nothing appearing to the contrary, shall be deemed to be an equal interest.

2. Where it appears that a plaintiff is entitled to the whole of a given sum in certain given rights, it is no objection to his recovery of it that it is not shown how much he is entitled to in each right.

Before presenting our readers with the points adjudged in the above-entitled cause, and the elaborate opinion of the learned judge by whom they were decided, it will not, it appears to us, be unconducive to a ready apprehension of the judgment, to state a few of those facts not specifically adverted to in pronouncing it, which preceded and caused the institution of the suit.

Previous to the year 1797, Joseph Sands had been the common consignee of various shipments made to France by John Jones Waldo, in his individual capacity; the house of Francis, Waldo and Waldo trading under the firm of Waldo, Francis and Waldo, of Comfort Sands, individually, and of Comfort Sands and Lewis Tracy, jointly. These cargoes Joseph Sands had sold to the French government, and taken from its officers an acknowledgment, in his own name, for the amount at which he settled the debt due from the government for them. as for a debt due to himself. In 1797, Comfort Sands stopped payment, having previously assigned, for the nominal consideration of five dollars (see 10 Johns. 539), his interest in the debt unsettled to Nathaniel Prime, in trust to pay certain preferential creditors. This trust was never executed, in consequence of the fund having been paid to, and received by, the assignees of Comfort Sands, under the decree and affirmance subsequently mentioned. In February, 1801, Comfort Sands was declared a bankrupt. pursuant to the provisions of the bankrupt law of the Unit-

---

[1] [District not given.]

ed States [2 Stat. 19], and the defendants, Mowatt and Morris, appointed his assignees. Under the convention of the 30th September, 1803 (1 Laws U. S. § 142, art. 1), the amount due from the French government on the settlement made by Joseph Sands was liquidated at the sum of 526,469 livres tournois, including interest; for the payment of which, and other debts of the French government to our citizens, assumed by the United States, it was by the third article of the convention agreed, that the minister plenipotentiary of the United States in France should draw his bills on the treasury at Washington. By the act of congress of the 10th of November of the same year [2 Stat. 247] (7 Laws U. S., Old Series, 10) provision is made for the payment of such debts. By a further act of the 25th of April, 1808 [2 Stat. 498] (9 Laws U. S., Old Series, 140), it is enacted that the secretary of the treasury pay to the comptroller of the treasury the amount of bills drawn by the minister of the United States at the court of France on the treasury of the United States, and should be by him held in trust for such persons as might be adjudged to be entitled to it; and to that end should be deposited in the office of discount and deposit at Washington for safe keeping. By a subsequent section it is declared that all "suits or proceedings, at law or equity, to establish claims against or to any part of the sum deposited in the treasury on account of Joseph Sands, shall be commenced on or before the first day of November next in the circuit court of the Second circuit holden in the district of New York, or in the circuit court of the District of Columbia, to be holden in Washington county, in said District," with a right of appealing to the supreme court of the United States. Within the time limited the assignees of Comfort Sands filed their bill against Mr. Duval, the comptroller of the treasury, claiming, in right of their bankrupt, the sum paid into Mr. Duval's hands on account of the bills drawn by the minister of the United States in France in favour of Joseph Sands. In April, 1809, the now plaintiffs, Stokes and Bingham, filed their petition in the cause so instituted against Duval, claiming, as assignees of John Jones Waldo, part of the money sued for by the assignees of Comfort Sands, who thereupon amended their bill, made Bingham and Stokes parties by the description of "the assignees of John Jones Waldo;" and, without calling in question their title as assignees disputed their right on the ground of their being too late to claim it, as by the limitation of the act of the 25th of April, 1808, they were barred after the 1st of November of that year. By the decision in that suit the amount of the bills drawn in favor of Joseph Sands was directed to be paid by Duval to the assignees of Comfort Sands; but in the affirmance of that decree, which was appealed from, it is expressly said to be without prejudice to any claim which the assignees of John Jones Waldo may assert against the assignees of Comfort Sands for the money paid under the decree. Upon the foot of this decree, and to recover from the defendants, Mowatt and Morris, the proportion of John Jones Waldo in the sum received by them under it, the present suit in September, 1817, was instituted. Parker and Comfort Sands are now made parties, that all in interest might be before the court. Joseph Sands, the agent of all parties, adduced on behalf of the complainants, was the only witness examined.

LIVINGSTON, Circuit Justice. The court will proceed to a consideration of the several questions occurring in this cause without any previous statement of facts which appear on the pleadings or evidence. The same, when necessary, will be referred to. But in entering on this duty it is impossible to disguise the regret which has been excited by the very voluminous and expensive proceedings that encumber it, and which a few concessions, without any dereliction of right on either side, might have so easily prevented.

The first question of fact turns on the interest of John Jones Waldo in certain shipments of leather and other articles, which were made to France, in the year 1794, in conjunction, as is alleged, with Comfort Sands and Francis Lewis Jancy, and consigned to Joseph Sands, by whom they were sold to the French government, and who received from the officers of government an acknowledgment or liquidation in his own name, on account of those and other sales, for the sum of 376,451 livres, 5 sols and 7 deniers. Although the defendants have admitted an interest in these shipments and in this liquidation in John Jones Waldo, they have not thought proper to state the extent of such interest, although, in the frequent communications which must have passed between them and Joseph Sands prior to the commencement of this suit, they might have acquired a knowledge of it. This rendered proof of the fact necessary, from which it appears that the French government became indebted to Joseph Sands, as consignee of certain cargoes shipped to France by Comfort Sands, Francis Lewis Jancy, and John Jones Waldo, in the sum of 295,766 livres tournois, the third part whereof, to wit, 98.588 livres, 18 sols and 9 deniers, belonged to John Jones Waldo. In the year 1796 the French government settled the account of Joseph Sands, which then amounted for principal, including the demand just mentioned, and some others, to 376,451 livres, 5 sols and 7 deniers. This amount has been allowed under the convention of the 30th of April, 1803, made between the United States and France, and amounted, with interest, to 526,469 livres, and has been paid by bills drawn by the American minister on the treasury of this

country. The interest of John Jones Waldo in this liquidation being established, it is made a question whether he were solely concerned in that part of these shipments which appeared under his name, or whether they belonged to Joseph Waldo, John Francis, and the said John Jones Waldo, who were then trading under the firm of Waldo, Francis and Waldo. Of the existence of such a house in 1793, of which John Jones Waldo was a partner, there is proof; but it is very doubtful whether this was not a separate adventure of John Jones Waldo. No other interest is disclosed to Joseph Sands; and J. J. Waldo's going to France on this and other business in which the assignees of Waldo, Francis and Waldo were interested does not settle whether the French debt belonged to himself or to the firm of Waldo, Francis and Waldo, for in either case the assignees had an interest in the payment. Mr. Lee, also the agent of the assignees, and those gentlemen themselves, in their answer to the bill filed in this court by the assignees of Comfort Sands against Gabriel Duval and others, treated it as the separate debt of John J. Waldo, stating in terms that he, "unconnected with his partners, entered into some joint speculations with Comfort Sands and Francis Lewis Jancy." But it is of little or no importance in this suit, as it regards the assignees of Comfort Sands, whether the debt in question originally belonged to John Jones Waldo or to the house of which he was at the time a partner. The defendant Parker, who was alone interested in disputing this fact, admits that although in the speculation the name of John Jones Waldo alone appeared, it was on account of the partnership of Waldo, Francis and Waldo, whose assignees are now plaintiffs. But here another difficulty is interposed by calling for proof of the title of Bingham and Stokes to bring this suit as assignees of this firm. The court will not inquire what proof in ordinary cases would be expected of a bankruptcy, or of the assignment of a bankrupt's estate, in a foreign country, because the evidence before it is abundantly sufficient to establish such bankruptcy and assignment in the present case, at least so far as John Jones Waldo is concerned, and which is sufficient for the present suit. Without adverting to the declarations or letters of the bankrupt himself, written nearly twenty years ago, it is too late now for the assignees of Comfort Sands to dispute the fact. As long ago as in April, 1809, a petition was filed in this court on behalf of Bingham and Stokes, as assignees of John Jones Waldo, claiming part of this money; and, without disputing the verity of this fact, the assignees of Comfort Sands amend their bill in the action then pending against Gabriel Duval and others, and make Bingham and Stokes parties to it, calling them assignees of one John Jones Waldo; and they finally contest their right to any part of this fund, not because they had no title to it as such assignees, but because their application for it under the act of congress came too late. So also in a bill filed in the court of chancery of this state by the assignees of Comfort Sands against Samuel Dana Parker to obtain an injunction against his proceedings at law to recover from them John Jones Waldo's proportion of this money, as his assignee, under a commission of bankruptcy issued in the district of Massachusetts, they state, and as one of their principal equities, that the suit of Parker was for the same money which had been claimed by Bingham and Stokes, as assignees of John Jones Waldo, and which had already been adjudicated upon; and they complain much of the burthen which will be imposed on them if Parker is permitted to proceed at law, of proving that whatever interest Waldo may have had in this debt before his bankruptcy was assigned to the said Bingham and Stokes, as they have alleged. After this recognition of the complainant's right to represent Waldo, and availing themselves of it to defeat or stay an action of his American assignee, they cannot complain if the court does not throw upon the present plaintiffs a burthen which they were so unwilling to take upon themselves; especially as they have not thought it necessary to file a bill of interpleader against these different assignees, and who are now both before the court. On this point, then, the court is fully satisfied.

It is next said that, whatever may be done in this cause, the assignees of Comfort Sands will still remain exposed to Parker's suit in the supreme court of this state. If this court cannot make a decree which will be conclusive, and afford protection to the assignees of Comfort Sands, against every one who may exhibit a claim for this money, it is no reason for not doing justice to the complainants as far as it can. If Parker had not been made a party, a decree must still have been made, by which, however, he might not have been bound. But, as Parker is not only a defendant, but has expressly admitted this to be a partnership concern, and has expressed his willingness to submit to a decision of this court in the premises, it is not hazarding much to say that a decree, under these circumstances, will be a bar against him, before whatever tribunal he may hereafter think proper to agitate his claim. But, admitting the present plaintiff entitled to sue for any demand due to Waldo, or to the firm of Waldo, Francis and Waldo, it is supposed that the act of congress which passed on the 25th of April, 1808, and the proceedings under it in this court in relation to this debt, which were affirmed on appeal to the supreme court, are a bar not only to this suit, but to every person who may at that time have had any claim on this property. To this doctrine, as at all applicable to the present case, this court cannot assent.

It is the peculiar doctrine of a court of chancery that none but parties to a decree are affected by it. If Joseph Sands, under this act, had received the whole sum in the treasury, as might well have been the case, the debt with the French government having been liquidated, and the bills of General Armstrong drawn in his name, would this have relieved him from responsibility to those who were originally and solely interested in this demand, and for whom he had acted as trustee? If, in the same way, any one of the parties originally concerned has received not only his own share, but those of his associates, shall he be permitted to retain the whole, because in their absence he had shown a right to receive it, and had obtained a decree accordingly? But if this doctrine of the conclusiveness of a decree of the court of equity on all the world, whether parties or not, were generally true to the extent in which it has been stated, a court would feel no small solicitude to withdraw from its operation a case like the present; for when it is recollected that these plaintiffs have done all in their power to make themselves parties to the suit in which this decree was made, but were prevented by the present defendants themselves from showing any title to the money in the treasury, because they had not made their claim within the time prescribed by the act of congress, it is not with a very good grace that they interpose an ex parte decision thus obtained to an investigation at this time of their pretensions. This is not an attempt by an original bill to disturb or correct a decree made in a former cause. On the contrary, that decree is made in part the foundation of the present claim. The plaintiffs do not impeach or desire any alteration in that decree, but undertake to show that, although the money in question may have been properly received under it, the defendants, for reasons which did not appear to the court, are liable to account to them for the whole or a part of it. But all difficulty on this point, if there were any, is removed by the decree of affirmance, which it is declared shall be without prejudice to "any claim which the assignees of John Jones Waldo may assert against the assignees of Comfort Sands," for the money "paid under the decree hereby appointed." This reservation, looking directly to the present demand, has been treated as meaning nothing. But this court is of opinion that it not only removes every doubt from this part of the case, but that it is an injunction on it to examine into and decide upon the present claim, which it has no right to destroy. It was also urged under this head of argument that the limitation in this act created a bar to the present suit; but it is manifest that no other limitation is thereby created than as regarded the actions which were to be commenced under the act against the comptroller of the treasury, otherwise so short a one

as six months would not have found its way into the law; and it would have been worse than useless in the supreme court to insert in its decree the reservation just mentioned, if the understanding which is now put on this limitation be correct.

The court will now proceed to the consideration of another objection which, although not the next in order, must, if it prevail, be fatal to the present and every other attempt to recover from any one anything on account of the interest which John Jones Waldo once had in this fund. It is said that the whole of it was sold by Joseph to his father, Comfort Sands, some time in the year 1802, to reimburse the former for certain demands which he had against Waldo, and to satisfy which he had a right to sell, and actually did dispose of, this debt. If a valid sale to C. Sands took place, all inquiry as to the subsequent disposition of Waldo's proportion of the French debt may stop here, because C. Sands, in that case, as its vendee, became the legal owner, and he only can have an interest in looking after it. But, if no sale took place, or a fraudulent one, we shall have to proceed in the inquiry. In examining this part of the defence it will be necessary to look at the testimony of Joseph Sands, at the correspondence which took place between him and the agent of Waldo at and immediately preceding the alleged sale, and at the conduct of Comfort Sands about that time, and subsequent to his becoming the purchaser. It will not here be necessary to be very particular in inquiring into the extent or nature of the claims which Joseph Sands had on Waldo at the time of the pretended transfer of this debt to his father, because a decision of this part of the cause will not depend so much on the magnitude or nature of his demands as on the fact of sale, which is altogether denied by the plaintiffs, and the regularity of the sale, if any there were, which is set up. If it be conceded that Joseph Sands (and so is the testimony) had some claim on Waldo which was a lien on his portion of the French debt in his hands, it would seem to follow that he must have a right to sell, or such lien, in cases where the subject of it might not be worth redeeming, would be of no value. But how is he to sell? If a sale in private, and without notice, as was the case here, be allowed when no time of payment is settled by the parties, there will be no security against fraud; and, if notice be ever necessary, it can never be more so than when a property of this fluctuating value is to be disposed of, and no particular time set for its redemption. It cannot be pretended that such notice was given. On the contrary, it is clear from the testimony arising out of the correspondence of the parties, that, although a day for the sale was once fixed by Joseph Sands, and notice given to the agent of the parties, yet that none took place on that day; and there is no evidence that any

other day was appointed, or notice given; and even this notice 'was so very defective as to mention neither the hour of the day nor the place where the sale would take place. The correspondence opens with a letter from Mr. Prime to Mr. John Lee, dated the 25th August, 1801, in which he states the demand of J. Sands against John Jones Waldo at about four thousand dollars, and intimates that his interest in the French debt will shortly be sold, unless this demand be paid. At the same time he lets Mr. Lee know that his (Mr. Prime's) note to J. J. Waldo will be taken in part payment by J. Sands. When this correspondence commenced, it is worthy of attention that Mr. Waldo was in Europe, and Mr. Lee but imperfectly instructed in the nature of Mr. J. Sand's claim against him. Mr. Lee, in his answer, dated 17th September, 1801, protests against the sale of this property until the account between J. Sands and Waldo is brought to some adjustment. On the 30th of September, 1801, Mr. Lee again expresses his expectations to Mr. Prime that J. Sands will take no measure for the sale of the French debt until a settlement of accounts between him and Waldo, Francis and Waldo; and that he has no objection to let his note be applied to any balance which may be due to J. Sands. This letter being shown to J. Sands, he writes to Mr. Lee, on the 6th October, 1801, that the balance due to him from Waldo admits of no dispute, and refers to his account of the 5th October, 1797; and informs him that he will defer making sale of the French debt until the 15th of January next, on which day it will be sold, if the business be not settled. On this letter only one remark will be made, which is that J. Sands himself thought some notice of the sale necessary. Whether such notice were properly given to an agent, at the distance of so many thousand miles from his principal, it is unnecessary to say, because it is very certain no sale took place on the day fixed by J. Sands. On the 4th of October, 1802, a whole year after the last letter, Mr. Lee writes to J. Sands that, not having received the necessary instructions from the assignees of Waldo, Francis and Waldo for the settlement of his account, and wishing to have it brought to a close, proposes to have the business settled in Europe, and that Mr. Prime's note shall be taken in part payment. If this plan does not meet the approbation of J. Sands, Mr. Lee wishes him to suggest a more eligible one. This letter was delivered by Joseph Sands to his father, Comfort Sands, who, by a letter dated the 17th October, 1802, informs Mr. Lee that his son had received his letter of the 4th inst., and had requested him to inform Mr. Lee that the proposition contained [in] it, respecting the settlement of Mr. Waldo's business, was fair, but that nothing could then be done, as the French government were revising all their unsettled American claims; that J. Sands had written to McPherson on this subject; and that they must wait for an answer before anything could be done with Waldo's proportion. He then states that J. Sands has credited Waldo's account with the 1,500 dollars which Mr. Prime owed him. In the same letter he informs Mr. Lee that it is probable that this debt will be funded, and stock given for it; that when this is done the transfer can easily be made, and the stock must soon get up to sixty or seventy per cent.

Admitting a sale had been made by J. Sands to C. Sands of the share of Waldo, which is very far from being proved, it was prior in date to this letter, which must therefore be regarded as an entire waiver of it; for the pretended purchaser throughout the whole of it considers Mr. Waldo as still the proprietor of this debt, and consents to the mode which he proposes of settling the business between Waldo and his son; the only impediment to which at that time was the impossibility of making a transfer of Waldo's proportion of the debt. Prime's note to Waldo was actually credited by the son, if we may believe the father, which was the only part of the proposed arrangement capable of immediate adjustment. Now it is not very material whether J. Sands dictated this letter, or not, of which he has no recollection; nor whether he credited Waldo with the amount of Prime's note, which it is probable he never did, for no settlement seems ever to have taken place between these parties. It is sufficient, for the purposes of the question now under discussion, that the person who is set up by the defendants as owner of this portion of the debt under a sale from J. Sands disclaims, or fraudulently conceals, any interest of the kind. The court, therefore, totally disregards any assertion of his to the contrary, made in his answer, filed the 14th September, 1808, to the bill filed against him and others by his assignees. If a formal transfer or sale had been made in writing,—which it is agreed was not the case,—it was solemnly waived, and that immediately after it took place, if it ever had an existence, by the only person who had any interest in it. The court is therefore of opinion that no sale of this debt was ever made to C. Sands by J. Sands; that, if a sale were made, it was irregular and void, and, under the circumstances of the case, could have given C. Sands no rightful control over the debt; and, further, that if the sale had been conducted with every legal precaution and solemnity, and had been ever so fair, it was waived by the party in whose favor it was made; and that the rights of Waldo, therefore, remain, for the purposes of this suit, precisely as though no such disposition of this part of the debt had been made by J. Sands. But it is said that, independent of any sale, it appears that J. Sands, in October, 1802, or thereabouts, transferred to Comfort Sands the whole management and

control of the residue of the French debt; and that, although no writing was executed of such transfer, yet that Mr. McPherson, who had been left in Paris, as the attorney of the concern, was directed, by letter from J. Sands, to hold the said claim, or residue thereof, subject to the control and orders of Comfort Sands. That such breach of trust was committed by Joseph Sands, and such directions given by him to Mr. McPherson, there is some reason to believe; and that Comfort Sands, whom the son knew to be a bankrupt, did assume a control over the residue of the said debt. If, therefore, he had sold or disposed of the share belonging to J. J. Waldo, or any part thereof, the assignees of the latter must look for compensation to him, or to J. Sands, or to Mr. McPherson, and not to the assignees of C. Sands; but if it shall appear that the sale made by the order of C. Sands, subsequent to his bankruptcy, was out of that portion of the French debt which belonged to himself, and that his assignees have considered and treated the sale in that light, and have actually received of other persons concerned in such sale some of their proceeds, on the ground of their fraudulent agency in the transaction, such sale must be regarded as affecting the interest of Comfort Sands, and not that of John Jones Waldo; not only to the extent of such recoveries against others, but, so far as the court shall be satisfied, either by the acts of the parties or otherwise, that such sale was made out of the share or proportion of the French debt belonging to Comfort Sands when he became a bankrupt. This part of the cause is involved in considerable difficulty, and perhaps no result entirely satisfactory will ever be obtained. It is much to be regretted that the present assignees of C. Sands, or those who preceded them in that trust, had not given earlier notice to Mr. McPherson of his bankruptcy, and of their appointment, as it would have put an end to his interference with the debt, and prevented much of the trouble and expense which such intermeddling has occasioned. Mr. McPherson, although it must have been known in this country, early in 1801, that he had the charge of the French debt, received no intimation of the bankruptcy of C. Sands until four or five years after. In the meantime, by the order of C. Sands, as defendants say, he not only disposed of a very large portion of this debt at a reduced price, but also paid the proceeds in conformity with instructions from the same quarter.

It appears that in April, 1803, Mr. McPherson, under orders received from Comfort Sands, sold 145,000 livres of the principal of the debt standing in the name of J. Sands at a discount of 50 per cent. to Mr. Fulton, and the interest thereon, if interest were eventually allowed, at a discount of 60 per cent.; that the sum received in specie in consequence of this sale was about 94,192 livres, subject to several deductions for expenses and commissions of Mr. McPherson in effecting it. On a discovery of this sale, and of the agency of Mullett and Evans in it, to whom the bankruptcy of C. Sands was known, and who had actually proved a large debt against his estate, his assignees filed a bill in the court of chancery of this state against C. Sands, J. Sands, Thomas Mullett, and Joseph Jeffries Evans. The object of this bill was to obtain a reduction of the debt proved by Mullett and Evans, and to render them and C. and J. Sands liable for what had been received or appropriated by them of C. Sands' share of the French debt at the time of his bankruptcy. This bill, among other matters, alleges: That Joseph Sands, before he left Paris, informed Mr. McPherson of the interest of his father in the French debt, and instructed him to pursue his directions in the disposition of so much of it as belonged to him. That Comfort Sands, before or soon after he obtained his discharge, as a bankrupt, set on foot a scheme to obtain the said debt due to him as aforesaid, or to dispose thereof, or apply the proceeds to his own use; or to vend for the use of some other person or persons, in fraud of his creditors, who had or should prove their debts, under the commission of bankruptcy which had been awarded against him, except Mullett and Evans, whom he designed to favour at the expense of his other creditors; and that Comfort Sands, for this purpose, advised them of the amount and situation of the said debt when he became a bankrupt, and instructed and authorized them to direct and advise Mr. McPherson from time to time, in the exercise of his authority over the said debt due to C. Sands. That C. Sands also instructed McPherson how he should conduct himself in the exercise of his power, derived from J. Sands, over the said debt due to him when he became a bankrupt. That Joseph Sands was also well acquainted with this scheme of his father to prevent his assignees from obtaining the said debt. That they are informed and believe that McPherson, who they also allege knew of the bankruptcy of C. Sands, in the month of April, 1803, in conformity to instructions given to him by C. Sands, J. Sands, and Mullett, or some or one of them, sold to Robert Fulton, of the said debt which was due to C. Sands, 145,000 livres of the principal, at 50 per cent., and 58,000 livres of the interest thereon at 40 per cent., by which sale 50 per cent. of the principal and 60 per cent. of the interest was sacrificed; McPherson then well knowing that C. Sands was a bankrupt, and that this debt belonged to his assignees; and that of the monies arising from this sale Mullett and Evans had received 83,393 livres, or thereabouts, which they had retained towards satisfaction of their debt proved against C. Sands, or otherwise applied the same in fraud of the complainants; and that the residue of their monies arising from this sale had been paid and applied by McPherson, under the

directions of C. Sands, J. Sands, and Thomas Mullett, or one of them, or remitted the same to C. Sands, or paid the same, to his use, to some person unknown to the complainants. That McPherson, acting under the same authority and instructions, had remitted to Mullett and Evans, or to one of them, 31,500 livres, which they have applied towards payment of debts proved by them against C. Sands, or otherwise applied the same in fraud of the complainants. The bill then states that McPherson had sold all the said debt standing in the name of J. Sands, except 119,854 francs, or thereabouts, which had been remitted, by the American minister in France, in bills on the treasury of the United States, to be paid to whomsoever the same might belong; which the complainants had also applied for, as belonging to C. Sands, when he became a bankrupt. The bill then states that if the complainants, as assignees of C. Sands, are not entitled to the sum thus paid into the treasury, or some of it, the whole of the said French debt, which was due to C. Sands at the time he became a bankrupt, has been received or disposed of and applied by C. Sands and J. Sands, or by said Mullett and Evans; and if the complainants shall appear to be entitled to the said sum of 119,854 livres, or some part thereof, the residue of the said debt, deducting such sum, will appear to have been wrongfully and fraudulently disposed of by Comfort and Joseph Sands, or one of them, in such manner that they or one of them will appear accountable to the complainants, as assignees of the former. The bill then alleges that £3,438:18:5 sterling, which was remitted of the said debt by McPherson, went to Mullett and Evans; and that the complainants believe, from a letter of McPherson, that he had disposed of all the said debt in the name of J. Sands, except the 119,854 livres aforesaid, as well what actually belonged to C. Sands when he became bankrupt as what belonged to other persons for whom J. Sands acted; by reason whereof they insist that C. Sands and J. Sands are accountable to them for the said debt, which belonged to C. Sands, or so much as had not been remitted by the American minister, as aforesaid. The complainants, after setting forth several letters from McPherson, respecting this debt, charge that C. Sands and J. Sands, after the bankruptcy of the former, continued to direct McPherson in the disposition of the debt due to C. Sands, and that Mullett had also some control over McPherson, and that all or the greater part of the debt due to C. Sands when he became a bankrupt has since been received or sold by McPherson, and the proceeds or amount thereof remitted or sent to Mullett, or some other person or persons designated by C. Sands and J. Sands, or one of them, for that purpose; the whole or greater part of which remittances and application of the proceeds of said debt were unlawful, as it regarded the complainants, and was in fulfillment of a fraudulent combination between C. Sands, J. Sands, and Mullett to defraud George Codwise, Junior, and others, who are complainants in certain suits in the said court of chancery against C. Sands and others, for the benefit of C. Sands, J. Sands, and Mullett and Evans. The bill then charges Mullett and Evans with receiving from the British government a large sum on account of the illegal capture of the ship Prudence, which belonged to C. Sands, which was not credited when they proved their debt against his estate.

To this bill is annexed an oath of one of the complainants, made the 11th of June, 1808, in which he swears that he is informed and believes that out of the proceeds of the debt disposed of or assigned by McPherson, Messrs. Mullett and Evans, since they proved their debt against the effects of C. Sands, have received large sums of money, amounting to 115,000 livres, or thereabouts, which they have retained, or have applied the same as directed by C. Sands and J. Sands, or one of them, since the former became a bankrupt. The whole, or the greater part whereof, he understood and believed was the property of C. Sands when he became a bankrupt; and that, except the interest of C. Sands in the bill remitted by the American minister, he believes that the whole of the said debt due to C. Sands has been received, sold, assigned or disposed of by C. Sands, J. Sands, and Mullett and Evans, and the proceeds applied towards the payment of a debt formerly due from C. Sands to Mullett and Evans; or in some other way unlawfully, and in fraud of the creditors of C. Sands.

The court has been thus particular in its extracts from this bill because they show, what is very important in the examination of this cause, that the assignees of C. Sands considered, and so alleged in their bill, more than four years after the sale by McPherson to Fulton took place, and after seeing his letters on the subject, and after they had time enough to acquire the most accurate information, that it was made in collusion with C. Sands, and out of his portion of the debt acquired before his bankruptcy, and to secure some of his creditors to the prejudice of them, or for some other fraudulent purpose. Now, the present complainants are not obliged to prove that there was a recovery by the defendants from Mullett and Evans and Joseph Sands to the whole extent of this sale; not only because they are strangers to that suit, but because it is not improbable that the referees, on whose award the decree proceeded, may have thought that some of the proceeds arising from this sale were rightfully disposed of in consequence of antecedent liens by C. Sands, or for some other reason; and that so far the complainants were entitled to no relief against any of the parties before the court; or they may have thought (for we are left to conjectures) that Mullett and Evans were not liable for such of the proceeds of this sale as did not come to their hands. The important

fact is that the assignees, and probably the referees, considered and treated the sale by McPherson as a disposition of so much of the share of C. Sands which belonged to him at the time of his bankruptcy. It is also deserving of notice that, although they state that J. Sands, while in France, and while agent for C. Sands, was also agent for one Waldo, and some others, who had or pretended to have demands on the French government, which were also liquidated in the name of J. Sands; yet they do not make any one of these persons a party to their bill, under an allegation that they were ignorant of their Christian names. The court is not required to decide whether Mr. Waldo or any other persons ought to have been made parties to this bill; but it has a right, from their not being so, to infer that their rights would not be much attended to; and, if it had been proved—which does not appear to have been the case—that the part of the debt sold by McPherson really belonged to Waldo, as in that suit he could have had no decree against any of the parties for such sale, so it is not reasonable now to presume that such was the fact, unless the testimony on that point were produced, and proceeded from witnesses against whom no objection could be alleged; especially as it would be no difficult matter to make the referees believe, in the absence of all the other parties concerned, as was the interest of the assignees of C. Sands, and probably the fact that the share of C. Sands had alone been broken in upon by McPherson. That such was the case may well be supposed if C. Sands were really actuated by the fraudulent motives which his assignees impute to him, for it would then be his interest, or at least his object, to place beyond their reach every part of this debt to which his title had accrued antecedent to his bankruptcy; for the right, which it is pretended he had acquired to the proportion of Waldo, being subsequent to his bankruptcy, could not be claimed by them, and he might be willing to let that remain as it was, and take the chance of a better market, which appears to have been his intention, as far as can be collected from his letter to Lee, of the 17th October, 1802. That such was the case may also be inferred from the sum which was sold by McPherson, which was within a few thousand livres of the whole interest which C. Sands in his own right claimed in this fund. The same intention in C. Sands may be collected from the instructions which, from time to time, he sent to Mr. McPherson on this subject. In his letter of the 10th November, 1802, Mr. McPherson is directed to raise and remit to Frederick Roberts £600 sterling by a sale of this debt whenever one could be made at 50 per cent.; and by other letters written between the 10th November, 1802, and the 20th April, 1803, the agent in Paris is ordered to raise, by sales of this debt, to the amount (including the £600 just mentioned) of £3,438:8:5 sterling. He is also requested to pay out of it $896.66 to Skipwith. C. Sands also drew on him in favour of John McPherson, payable out of this debt, for 2,500 livres, which was accepted. In none of these letters is any intimation given, so far as we know, that the debt to be sold for the purposes above mentioned was any other than the portion owned by C. Sands,—a turpitude greater than any with which the assignees have charged him. We cannot believe that at the very moment of writing to the agent of Waldo, and flattering him with the funding of this debt, and its consequent appreciation, and claiming no right whatever to or control over it, he should transmit orders to Mr. McPherson to dispose of his share, or any part of it; for not a month had elapsed between his letter of the 17th October, 1802, to Mr. Lee, in which these flattering prospects are held out, and his first letter to Mr. McPherson ordering the sale. He might easily, from the practice of others, reconcile it to himself, however incorrect in principle, to apply his own property to the payment of some of his creditors in exclusion of others, and which is admitted by the defendants to have been his object; while nothing but the greatest depravity, and which no course of reasoning could excuse, could have prompted him to practice on Waldo the duplicity and injustice which must be imputed to him before it can be believed that he deliberately converted to his own purposes the property of this gentleman. And, even if the defendants think that he would be restrained by no moral sense from the perpetration of so complicated a fraud, his own interest, which he appears ever to have in view, would have deterred him from so early a disposition of that part of the debt which belonged to Waldo; for he was not so ignorant as not to know that after his letter of the 17th October, 1802, to Mr. Lee, he could assert no title to it, and that he would of course be liable to its owner for any injury which might result from a premature aberration of Waldo's interest against an action for which his discharge from his old debts would furnish no protection. Nor is there reason to think that McPherson, at the time of the sale to Fulton, supposed he was disposing of any part of this debt other than what originally belonged to C. Sands. But, if the matter were more doubtful than it is, the reasonable presumption, in the absence of positive proof to the contrary, is that C. Sands, by these directions, intended to exercise a dominion over a property to which McPherson knew his title was indisputable, and which Comfort Sands himself might think he had a right to sell, than over that portion which, although it stood in the name of J. Sands, was known to McPherson to belong to Waldo, and the sale of which, under such circumstances, by the authority of C. Sands, might well have involved him in serious responsibilities to the original cestui que trust. It appears also by a letter from McPherson to Macomb, who was then the assignee of C. Sands, dated 10th November, 1807, and which is copied into the bill of his assignees against Mullett and others, that

he acted, in the sale to Fulton, under the power given to him by J. Sands, and in concert with Mullett, a principal creditor of C. Sands, with whom he says he had kept up a regular correspondence since 1801. Now, it is not easy to discover what connection a creditor of C. Sands would have with Mr. Waldo, so as to satisfy McPherson of any right in him to exercise a control over his part of the debt. Although no designation may have been made at the time of the sale to Fulton, from whose share a deduction was to be made of the amount sold, yet it must have been understood by all the parties concerned, considering its object, and the appropriations to be made of the proceeds, that it was made out of the share belonging to C. Sands. It was evidently an afterthought of Mr. McPherson, that it "would be equitable that each set of owners of the whole liquidation should bear their share of loss on the sale to Fulton, as it was made out of the entire liquidation previous to the Louisiana treaty, and at a time a war was apprehended in America on account of the New Orleans business." And yet, were this opinion acted upon, it would produce a more unfavourable result to the defendants than the one to which the court will be led by the view which it is taking of the whole of this transaction. On the opinion expressed by Mr. McPherson, the court will only remark that if the sale had originally been intended to operate on the mass of this liquidation, Mr. McPherson, who was an intelligent and faithful agent, and thoroughly acquainted with the subject, would have said so, and not have assigned as a reason for his opinion a circumstance which might have been a very good one for Waldo's ordering a sale, but is none at all for making him participate in a loss which was produced to satisfy the claims of others, and when no part of the proceeds was applied to his benefit. If the residue of the liquidation had perished in the hands of McPherson, the representatives of Waldo could have set up no claim to any portion of the monies received from Fulton; and, if they had, where were they to' be found, or against whom would their remedy have been? Nor can there be any doubt that the referees regarded this disposition by McPherson as affecting solely the interests of C. Sands, as his assignees had alleged; for it is impossible, in any other way, notwithstanding the obscurity which surrounds this part of the case, to account for the very large debt which is awarded against Mullett and Evans and J. Sands. The debt which they had proved is reduced $22,970.81; the debt created is $13,534.24; making an aggregate of $36,505.05.

Admitting the whole of the reduction to be on account of the Prudence, which is probable enough, still the sum of $13,534.24 is allowed to the assignees of C. Sands for the intermeddling of those defendants with the French debt, or with that part of it which was sold by McPherson, which could have been done only on the basis that at least so much of the money received of Fulton was produced by a sale of what belonged to C. Sands prior to his bankruptcy. It will be remembered that Skipwith was also paid out of these proceeds, which, added to the sum just mentioned, will leave not more than three thousand dollars, or thereabouts, unaccounted for, of the monies arising from this source. If the claim for the Prudence constituted the whole of the reduction, although Mr. Varick, one of the referees, thinks that part of what was received from the French debt formed an item of it, yet it is sufficiently apparent, from the short statement just made, not only that the assignees of C. Sands considered McPherson as having sold his share, but also that the referees were of the same opinion. Why the whole sum was not allowed against Mullett and Evans and Sands, if it were not, may have been owing to the referees considering, as they did, what was paid to Skipwith as a rightful appropriation by C. Sands pro tanto. The referees must also have viewed this debt, after its liquidation in the name of J. Sands, as the counsel of his assignees have done, and as the court does; that is, they must have considered each party concerned as having a divided or separate interest, to the extent of his original share in the different adventures, out of which the whole debt arose, and a right to control and dispose of his own share as he pleased, without consulting any other who had an interest, or affecting his rights. Whether Jancy, Waldo and Sands were partners or not in the shipments to France, the court entertains no doubt that they might each, after the liquidation, direct J. Sands how to dispose of his particular share, and that such disposition by him would not have rendered him liable to the others for whom he was trustee. So also was this connection regarded by all the parties to it. With Jancy, J. Sands settled for his share, and considered C. Sands and Waldo as each representing an individual or separate, and not a joint or partnership, interest in this debt. The mention which is incidentally made in the bill against Mullett and others of the monies in the treasury cannot affect the view which has been taken of the general scope of the bill, and of the proceedings on it. The assignees of C. Sands went for the whole of the dilapidation, which they themselves locate over and over again on his portion of the debt; and the referees, according to this opinion, were not at all influenced by the cursory notice which had been taken of the money in the treasury, nor did they intend, directly or indirectly, to decide to whom that belonged. It is now, then, too late for these gentlemen to say that they asked compensation for these fraudulent applications by C. Sands, only in the event of their not being entitled to the monies which were received for the residue of this debt, under the Louisiana convention. This election or substitution of another fund

ought not to be tolerated, after they have not only asserted, but must have proved, that the portion of the debt alienated by McPherson belonged to C. Sands before his bankruptcy, and that he alone, or in conjunction with his son, ordered the sale. This fact being once established whether they had recovered from Mullett or not, would diminish to that extent their interest in this debt, and ever be fatal to the claim which they now assert for the whole of the money in the treasury; but when, in addition to this, it appears that they have excluded every other person from recovering anything of Mullett and Evans on this account, how can they now expect to be permitted to fix any of this loss elsewhere? The assignees of C. Sands boast of their industry in tracing to its source the loss which this fund had sustained, and spurn at any attempt on the part of the plaintiffs, who have so long, they say, been asleep, to claim any contribution out of the sum thus recovered. As it is not the intention of the court to let the plaintiffs into any participation with the assignees of what was thus received, it is unnecessary to inquire whether any negligence be justly imputable to them for not uniting in the suit against Mullett and others, of which, however, they were entirely ignorant. As to the allegation that it was agreed between C. Sands and J. Sands, after the bankruptcy of the former, and the return of the latter to the United States, that the original proportion of the French debt belonged to C. Sands, and the interest thereof should be preserved for the use of his creditors, subject only to certain liens subsisting at the time of his bankruptcy, the court considers it as a mere pretence, and having no foundation in fact. And here it may be well, once for all, to observe that, although J. Sands appears as a witness for the complainants, the court does not think itself bound to believe all that he has said, either on his direct or cross-examination; for although a party who produces a witness be not at liberty to impeach his character, yet if it appears from his own showing and former conduct, as exhibited by himself, that certain parts of his testimony are liable to objections, the court may believe him or not, as it thinks proper. To the part of his testimony now under consideration is opposed the nonproduction of any such agreement with his father, as is here relied on; as well as the very great improbability that either of them would enter into an arrangement for the benefit of creditors, to whom neither of them appear to have borne much good will. Another answer is that, if such agreement were made, there is no evidence of its being observed by C. Sands; and the defendants themselves in the suit, which already has been the subject of so much animadversion, have charged and proved on him a violation of it. Nor is there a single letter, or any other document, to show that such instructions were given to McPherson, who would not have failed to obey them,

and somewhere or other to have mentioned them. Nor can it be credited that, while J. Sands was most improperly putting under the control of an insolvent parent, so valuable a property of a gentleman then in Europe, for whom he was trustee, that he should be so very scrupulous of the rights and interests of the creditors of another; and if such solicitude really existed,—which we find contradicted at every step which we take in the cause,—why did he not at once give the assignees of his father a letter to McPherson, apprizing him of his bankruptcy, and directing him to settle with them for his part of the debt? The defendants, therefore, cannot be offended at the court's discrediting a story of which it is impossible that they themselves can believe a single syllable.

If the view which has thus far been taken of this subject be not erroneous, it will follow that the present plaintiffs were entitled to a very considerable portion of the money in the treasury; much greater, indeed, than they will probably receive under the decree which will be made; for there is no calculation or deduction which can be considered as at all reasonable which will not give them more than one-third of it, to which, on former occasions, they have limited their claim. Although it is easy to see how the assignees of Waldo have fallen into this mistake, yet, as the defendants have been considered as committing themselves by their bill against Mullett and Evans, it is but just to apply the same rule to the complainants. The court does this with some reluctance, because it is satisfied that there is no just calculation by which their interests in that fund can be so much reduced.

Although it cannot be necessary, after this intimation, to go through the different calculations which have been suggested, all of them being merely conjectural, and none of them very satisfactory, some items which the defendants have insisted on will be adverted to, in order to show that several of them, if allowed, would leave a larger sum than has been mentioned due to the complainants, and that others of them, on no principle, can be admitted.

|  | Livres. |
|---|---|
| Waldo's share in the liquidation was.. | 137,900 |
| If from this be deducted the sum transferred to Mullett,—the propricty of which may well be questioned....... | 31,500 |
| There will still remain.............. | 106,400 |

A deduction is also expected on account of J. Sands' demand on Waldo. This, as stated in his account of the 5th October, 1797, and confirmed by his letter to Mr. Lee, dated in October, 1801, is for principal and interest, 25,825 livres. which, if also subtracted, still leaves 80,575 livres, a sum much greater than the one-third of these monies. It is true, that J. Sands now makes out a much larger account against Waldo; but he has no right, at this time, to state his demand so very different from what he admits

it to have been, when he threatened to sell the debt, and so very shortly before, it is pretended, that it was sold. But whatever his claim may be, the court cannot perceive what title the defendants have to this deduction, which must of course leave so much the more of this fund in their hands. If Waldo's proportion of this debt was sold by J. Sands to his father, he is paid, it is to be presumed, for all his demands against Waldo. But if the debt were never sold, and that opinion has already been expressed, what right have the defendants shown to represent the demand of J. Sands, and to a deduction on that account? They have produced no title to it by assignment from J. Sands or in any other way. J. Sands is either paid or he is not. ·This is a question, however, in which the assignees of C. Sands have no interest. It will be time enough, when the assignees of Waldo and J. Sands litigate that question, for the court in which such suit may be pending to inquire whether the latter has so conducted himself as to be entitled to anything, and what, for his agency for that gentleman; or whether he be not liable to him for very heavy damages for a breach of trust.

As little reason is there for charging the plaintiffs with any part of the expense which was incurred in getting this money from the treasury. The complainants very properly inquire what benefit has been done to them by an act which they have always considered as one of great injustice to them. They were very willing to let the money remain where it was, until their rights were decided on. Both parties would have had an interest in a speedy decision. They have undoubtedly reason to regret the inconvenience and loss to which they have been exposed by this money's passing into the hands of the assignees, for which they are very unwilling to pay; nor can the court, under the circumstances of this case, see any propriety in throwing any part of this expense on them, unless it be for the costs allowed to Mr. Duval. Still less founded is the claim which is set up for any of the costs or charges which were incurred in the suit against Mullett and others. That suit was prosecuted for the exclusive benefit of the creditors of C. Sands. and turned out a very profitable one; but, as the plaintiffs get nothing of what was recovered in it, they ought to pay no part of its expense. Some merit has been attached to the assignees of C. Sands never having claimed any of the money in the treasury but what belonged to them. This may be, but their bill is so drawn as to claim the whole of it as their own. Although this bill was not filed until the year 1808, which was seven years after the return of J. Sands to this country, and after, it appears, that he had made them many communications respecting the French debt, yet no mention is made in their original bill against the comptroller of the treasury, of any interest

whatever in Waldo; and even when it is amended—which was after filing the petition of Bingham and Stokes—they say they are unacquainted with the "foundation or particulars of their claim"; and after being fully apprized that the assignees of Waldo asserted a right to a third of this money, they insist on excluding their claim from adjudication, because it had not been made within the time prescribed by the act of congress. The court will not say that they had no right to pursue this course, but it was not one much calculated to lay the present plaintiffs under any pecuniary or other obligations. The court will pass over some other sums which are insisted on as forming proper deductions with this single remark: that after allowing every one for which even a plausible reason can be assigned, and also charging them with their full proportion of what may have been lost by J. Sands' disposing of part of this debt to Ballard and others, as stated in McPherson's account, still there will remain for the assignees of Waldo more than one-third of the monies which came into the treasury, to which it has been thought proper, for the reasons already mentioned, to restrict their recovery. So also on a principle of contributing to losses in proportion to the respective interests of these parties in this fund, and of dividing what has actually been received or realized in the same way, the complainants would be entitled to much more than they will get under the present decree.

The principle which the court has adopted for the settlement of this controversy, and the sum which has been retained by the assignees, render it unnecessary to decide whether the dividends declared by the commissioners of a bankrupt are so conclusive as to protect the assignees against every one who may have a claim on what has been thus divided, but had given no notice thereof to the commissioners previous to the dividends being made; especially, too, as there is an abundant fund in hand to replace the one which had in part been divided.

It remains to dispose of the interest and costs. Considering the early notice which the defendants had of this demand, and that they received the monies under a full knowledge of it, without allowing an inquiry to be made into the title of the complainants, which they must have known was not a frivolous one, the court considers them as taking it at their peril. The ex parte judgment under which it was received ought not to protect them against a claim for interest, it being stated in the body of the decree that the present plaintiffs were too late to have their claim to this money decided on in that suit. The use of their proportion in this fund has been lost by the interference of the defendants; and, whether they have made anything by it or not, the loss to the assignees of Waldo is not the less on this account. And although seven years have now

elapsed since the receipt of this money, and although it was left undivided on account of the demand of the representatives of Waldo on it, not a single step is taken by the assignees of C. Sands, either by the proposal of an arbitration (which they were justifiable by law in making, and which it is probable would have been listened to), or by a bill of interpleader, to which the creditors of C. Sands and the representatives of Waldo might have been parties, or in any other way to bring the question to a decision; nor is any offer made to place the fund in a productive situation for the benefit of the party who should ultimately establish a title to it. Not only is no step taken to bring the question to an adjudication, but when a suit is brought by the assignees of Waldo very little facility is afforded in bringing it to an early decision, although there was nothing in the pretensions or situation of the plaintiffs to excite unpleasant feelings of any kind. For part of the time it is conceded that the money was divided between the assignees, and used as their own. The court is more inclined to give interest from the time the money was received, nor excepting the time of the appeals depending in the supreme court (the money being all that time in their hands), because even there it is probable the plaintiffs will receive less than they are entitled to. It is left to the commissioners of the bankrupt to say whether any, and what, portion of the interest shall be allowed as a charge by the assignees of C. Sands against his estate.

The question of costs admits of less difficulty. They will be very heavy; and it is easy to see that a great portion of them might have been avoided. There is no reason why, generally speaking, costs should not be given to a successful suitor in equity as well as at law. What, in the present case, is shown to entitle the defendants to an exemption? Have not the defendants rendered the suit necessary? Did they not take the money, as has already been observed, with full notice of the claim of the plaintiffs? Have they done anything by which its decision would be accelerated or expense avoided? The court can see no reason to throw these costs on the plaintiffs. They have been compelled to come into court in quest of a very valuable property, but of which only a remnant was left, and even that was withheld. Under these circumstances, they are entitled to costs; but as it is to be presumed that this money was intended and kept for the benefit of the creditors of C. Sands, they must be paid out of his estate. As to Benjamin Dunn Parker, the bill must be dismissed, with costs to be paid by complainants. The bill is also dismissed as to Comfort Sands; but, as his improper interference in this business has occasioned much of the trouble and expense to which the complainants have been exposed, he will pay his costs.

Something having been said of a note of Nathaniel Prime to John Jones Waldo for $1,500 and upwards, the court, to prevent mistakes hereafter, will only observe that it considers the settlement of which that note was to form a part as never having taken place, and that therefore the note belongs to the representatives of J. J. Waldo; at least that their right to it is not to be in any degree affected by the decree of the court. It is a source of unaffected satisfaction to the court that this decree can be reviewed by either party, and that no one will be more satisfied than the court by which it is made in having its errors corrected.

| | |
|---|---:|
| The whole sum received into the treasury of the United States was | $22,472 65 |
| Deduct costs of Mr. Duval | 38 08 |
| | $22,433 57 |

No deduction is made for what was decreed to Havens and McPherson, for the claim of the assignees of Waldo extended to the whole sum paid in. One-third of $22,433.57 is $7,477.55. Seven thousand dollars, or thereabouts, it is admitted, was left undivided by the commissioners of the bankrupt. If this sum exceeds what was thus reserved, it has already been remarked that there are more than funds sufficient of C. Sands, in the hands of the defendants. Interest for seven years, commencing 1st January, 1812, to 1st January, 1819, at 7 per cent. $3,663.94,—making a total of $11,141.49.

The court therefore made the following decree in the cause:

Benjamin Stokes and James Bingham, Assignees of the Estate of John Francis, Joseph Waldo, and John Jones Waldo, and the said John Francis and Joseph Waldo vs. John Mowatt, Jun., and Robert Morris, Jun., Assignees of the Estate of Comfort Sands, Samuel Dunn Parker, and the said Comfort Sands.

This cause coming on to be heard on bill, answers, replication, depositions, and exhibits, and being argued by H. D. Sedgwick and Robert Sedgwick, Esquires, on the part of the complainants, and Caleb S. Riggs and Samuel Jones, Esquires, for the defendants, John Mowatt, Junior, and Robert Morris, Junior, and no one appearing to argue the same for Comfort Sands or Samuel Dunn Parker: It is ordered, adjudged, and decreed by the court that the defendants, John Mowatt, Junior, and Robert Morris, Junior, do pay to the complainants, or to their solicitor, on demand, the sum of eleven thousand one hundred and forty-one dollars and forty-nine cents of lawful money of the United States. And it is further ordered, adjudged, and decreed that the said John Mowatt, Junior, and Robert Morris, Junior, pay to the complainants their costs, to be taxed against them, the said John Mowatt, Junior, and Robert Morris, Junior; the said costs to be paid out of the estate of the defendant

Comfort Sands, in their hands. And it is further ordered, adjudged, and decreed that the bill be dismissed as to the defendant Samuel Dunn Parker, with his taxable costs, to be paid to him by the complainants. And it is further ordered, adjudged, and decreed that the bill be dismissed as to the defendant Comfort Sands; he, the said Comfort Sands, paying his own costs.

---

STOLLER (ERNEST v.). See Case No. 4,520.

STOLLEY (BLOOMER v.). See Case No. 1,559.

STOLLEY (BROOKS v.). See Cases Nos. 1,962 and 1,963.

STOLLEY (WILSON v.). See Cases Nos. 17,839 and 17,840.